CAROLINA NATIONAL BANK v. SENN.

KOEGAN v. SAME.

BATEMAN v. SAME.

1. On exceptions to homestead, the Circuit Judge declined to consider any questions other than that of the homestead allowed, and therefore only that question can be considered on appeal.

2. A person can claim homestead only against a debt of his own or of one

whose family he is a member of. Children of a deceased debtor cannot claim, each for himself, as the head of a family, a separate homestead out of the lands of the deceased debtor against his debt; but, collectively, they are entitled to one homestead, whether they be infants or adults.

3. Upon refusal to sustain the three homesteads set apart in this case, the Circuit Judge did not err in omitting to order a reassignment of a single homestead to the claimants as a family.

4. Where a petition for a homestead is refused, costs cannot be taxed against the petitioner.

Before COTHRAN, J., Orangeburg, October, 1885.

The opinion states the case. The Circuit decree was as follows:

It has already appeared from the nature of the proceedings, as well as from the statement of facts agreed upon, that the main question involved is that of homestead, pure and simple, and to that I propose to confine myself. It may be premised that the manifest construction by our Supreme Court of section 32, article II., of the Constitution, is that it is broad enough in its terms to admit of more legislation than was contemplated by the act of September 9, 1868 (16 *Stat.*, 19), which provides homestead only for debtors in execution. Besides these, two other classes of persons are now provided for, to wit, widows of husbands who would have been entitled, and all others being heads of families, against whom not even final process has been obtained. These provisions are about as ample as anything short of a total denial of all the rights of creditor in this behalf, or the boldest spirit of communism could demand.

Under which of these do the parties claim? Clearly not under the first or second. Then, are they entitled as standing in the third class? It will be borne in mind that the testator directed his debts to be paid, if possible, without the sale of property. Doubtless this inspired the removal of the widow and children from Columbia to the plantation in Orangeburg, and the dedication of the surplus income of the plantation and the proceeds of the sale of the Columbia property to the payment of debts. The sale, which seems to have been made at an unfortunate time, fell short of the purpose, and for which the executor had some receipts from the Orangeburg property. In the meantime the widow died.

At the death of her husband she had a constitutional right, as widow, to homestead, but there were no means then provided for the assertion of such right.

It appears, however, very clearly from the reasoning in *Norton* v. *Bradham* (21 *S. C.*, 375), that she was within the purview of the terms of the organic law. She was "the person entitled thereto." Could this personal right of hers have remained in abeyance from the death of her husband, to be brought into active exercise and fruition by subsequent legislation, as was had? I think so; and if so, did the right descend to her children? At the death of James Claffy, this was the only right of homestead in his lands. It was a constitutional right, but incapable of assertion for want of legislative provision to that end, and it inured to the widow. She died in 1875 without asserting it. It is needless to attempt to trace it further. But the parties here are not claiming the right to their mother's homestead. They set up their claims to three several homesteads! By what system of devolution (or evolution, either, as to that matter) can such result obtain?

Suppose James Claffy, at the time of his death, had owned four plantations worth $1,000 each, and owed $1,000 for money borrowed upon the faith of having $3,000 more than the homestead exemption. Again, suppose that he left four sons as devisees of the four plantations, respectively, each son being the head of a family, and the sons had been let into their devises by the executor upon the understanding that they should, from the use of the lands, pay off the $1,000, and afterwards some payments should be made upon the debt, the creditor indulging them, could it be seriously contended that after ceasing to pay, or to make further effort, that the creditor could be met successfully and his debt lost by the interposition of claims of homesteads to the whole estate? I cannot think so.

It is, however, insisted by the learned counsel for the claimants that this is a case of actual partition among the children, and that they are in exclusive possession, severally, of the parcels of land claimed as homesteads. I have already adverted to the fact that in the agreed statement of counsel this does not appear. It has been attempted, however, to maintain this by affidavits—always an unsatisfactory means of determining disputed facts.

The practice in this State, from the time of *D' Urphy* v. *Nelson*, as far back as 1st Brevard, down to *Huggins* v. *Oliver*, 21 *S. C.*, 147, with numerous cases intervening, has been formulated into a rule by Justice McIver, in the last named case, as follows: "That while, as a general proposition, it is true that lands of an intestate may be sold upon a judgment recovered against the administrator upon a debt of the intestate, yet, if the lands have passed into the actual and exclusive possession of the heirs before judgment has been recovered, and before any lien has been fixed upon them, they can no longer be sold under such judgments," &c.

It will be observed, however, that this was a case of intestacy, as were, also, the cases of *Martin* v. *Latta*, *Bird* v. *Houze*, *Jones* v. *Wightman*, &c. The case under consideration is one of testacy, with directions to the executor to hold the estate in hand until the debts are paid. It may be that the matter of partition and exclusive possession by the devisees, the claimants here, may avail them, if made out, as a means of holding the several parcels of land now in their possession, but it will be in a different right to that of homestead. Whenever the time comes for such assertion of right on their part, the court will move to its conclusion upon firmer ground than that which can be furnished by affidavit.

Wherefore it is ordered, adjudged, and decreed, that the plaintiffs' exceptions to the assignments of homestead in the said several cases be sustained, and that said assignments be, and the same are hereby, set aside. It is further ordered, that the plaintiffs have judgments, severally, against the claimants for their costs and disbursements.

*Messrs. Izlar & Glaze*, for appellants.

*Messrs. T. M. Raysor* and *A. B. Sawyer*, contra.

November 22, 1886. The opinion of the court was delivered by

Mr. Justice McGowan. The points of this case will be sufficiently explained by the facts admitted on the record:

"That on November 6, 1873, James Claffy made and published his last will and testament, as follows: 1. Debts to be paid out

of income of crops, and, as far as possible, without selling property. 2. After payment of debts, all his property, real and personal, to go, one third to his wife, Eliza, her heirs and assigns forever; the remaining two-thirds to be equally divided among his four children, Michael Robert, James Henry, Anna Maria, and Francis Peter, share and share alike, to them and their heirs and assigns forever. 3. Rufus D. Senn named as executor. James Claffy, at the time of making his will and at the time of his death, resided in the city of Columbia. Said will was admitted to probate, in the County of Richland, December 22, 1873. Rufus D. Senn qualified as executor on same day, and is now such executor. The wife and children named in the will survived testator.

"At the time of his death, the testator was possessed of considerable personal property, which went into the hands of the said Rufus D. Senn, as executor, and was seized of certain valuable real estate in Richland and Orangeburg Counties. Judgments in the above entitled actions were obtained in Richland County against Senn, as executor, in the year 1878. The causes of action on which said judgments were obtained arose subsequent to the constitution of 1868, and were simple contracts not under seal. Executions were issued in the cases of Koegan and Bateman, and valuable property in the city of Columbia was levied upon February 8, 1878, as the property of James Claffy, deceased, to satisfy the same. Transcripts of said judgments were docketed in Orangeburg County August 18, 1884. Leave to renew executions was granted December 3, 1884. Renewal executions were issued December 3, 1884, and lodged with the sheriff of Orangeburg January 28, 1885. The sheriff of Orangeburg, under these executions, levied on all that tract of land, containing 362 acres, situate in Orangeburg County, as before stated, as lands belonging to the estate of James Claffy, deceased, on February 23, 1885.

"The lands so levied are the same now in the possession and occupancy of the claimants, Robert M. Claffy, James H. Claffy, and Anna M. Darby, and of Francis P. Claffy, and which were in their possession before and at the time of said levy. The said Robert M. and James H. Claffy are now, and were at the time of said levy, heads of families; and the said Anna M. Darby is now,

and was at the time of said levy, a married woman, whose husband has not sufficient property of his own to constitute a homestead. That the said Robert M. and James H. Claffy, and Anna M. Darby, with their respective families, resided on different portions of said lands at the time of such levy, and now reside thereon. Robert M. and James H. Claffy and Anna M. Darby each claimed a homestead in the portion of land whereon they resided with their families. On February 23, 1885, a homestead in said lands was duly set off and assigned by metes and bounds to Robert M. and James H. Claffy and Anna M. Darby, respectively, by appraisers duly appointed and sworn for that purpose. That the homestead so assigned to each of the said parties consisted of the dwelling house and out-buildings of said parties, respectively, and one hundred and ten acres of the lands appurtenant thereto."

To these homestead assignments the plaintiffs filed the following exceptions: "First. Because the heirs of James Claffy, deceased, are not entitled each to a separate and distinct homestead out of the estate of their father, against judgments obtained against his executor before the estate was settled. Second. Because the claim of separate parcels of land by the children of James Claffy, deceased, does not entitle each to a separate homestead out of their father's estate against judgment debts of their father. Third. Because the widow of James Claffy being now dead, in no point of view could the children have homestead in their father's estate, except that on which their mother resided previous to her death, being the family homestead of their father. Fourth. Because the children are not entitled to their distributive share, over and above the exemption allowed by law to the head of the family (being a family homestead), until the judgment debts against their father have first been satisfied."

These exceptions came on to be heard by Judge Cothran, when other evidence was offered in addition to the "agreed statement" of facts, principally, however, in reference to the time when the family left Columbia and went upon the Orangeburg land, and as to an alleged parol partition of the same among the children after their mother's death (in 1875); that the children paid the taxes on the land, but always returned it as belonging to the estate of their father, &c. But the Circuit Judge, holding that the issue

made by the pleadings and the agreed statement of facts was that "of homestead pure and simple," confined himself to that question, and, sustaining the exceptions to the three homesteads as set off, set the same aside; and he further ordered that the plaintiffs have judgments severally against the claimants for their costs and disbursements.

From this judgment the three claimants appeal to this court, alleging error on the part of the judge in sustaining the exceptions hereinbefore stated, and also upon additional grounds, as follows:

"I. Because his honor erred in holding that the several claimants were not entitled, under the constitution and laws of this State, to a homestead in the lands actually held, possessed, and occupied by them respectively, the same consisting of their dwelling houses and lands appurtenant thereto; and the said Robert M. Claffy and James H. Claffy being heads of families, and the said Anna M. Darby being a married woman, whose husband has not sufficient property of his own to constitute a homestead.

"II. Because his honor erred in not allowing a homestead to the claimants, they being entitled to a homestead as the children of James Claffy, deceased, if not otherwise; and to have the family homestead exempted in like manner, as if their father were living, and to have the same appraised and set off to them.

"III. Because his honor erred in holding that although the widow of James Claffy was only entitled to the constitutional right of homestead at the time of his death, that this right 'was incapable of operation for want of proper provision of law to that end.'

"IV. Because his honor erred in not ordering a reappraisement of homestead to the claimants in the above stated cases."

There was argument at the bar to the point, that the judgments against Rufus D. Senn, as executor of the deceased debtor, James Claffy, could not levy and sell the land in Orangeburg, for the reason that it had, as alleged, been transferred by the executor to the exclusive possession of the children as devisees under the will, and therefore it was not liable to levy and sale according to the doctrine of *Huggins* v. *Oliver*, 21 *S. C.*, 147, and the line of authorities therein reviewed. It was also argued, that, as the debts were simple contracts of 1873, upon which judgments were

only rendered in Richland in 1878, and not lodged in Orangeburg until 1884, the claimants were protected in the possession of the lands by lapse of time and the statute of limitations. While, on the other side, it was suggested that there was really no absolute devise of the land to the children, but only "after payment of the debts," which was, in effect, to charge the land with their payment; that the executor, Senn, never gave unqualified assent to the devises, but, being responsible for the payment of the debts, still kept control of the land for that purpose; and, therefore, the possession of the children was merely permissive, and neither adverse nor exclusive. See 2 *Story Eq. Jur.*, § 1246; *Lupton* v. *Lupton*, 2 *Johns. Ch.*, 614. But as the case was before the Circuit Judge simply on exceptions to the allowance of three homesteads, he declined to consider any other question except that of homestead as allowed; and, of course, there can be no other question before us on appeal from his judgment. Some of the matters indicated in argument may be important—too important, at all events, to be considered incidentally upon a mere question of homestead—but they are not before this court, and in order to prevent possible injustice, we take occasion to state that whatever is said here is intended to be entirely without prejudice, except as to the very points ruled.

Then as to the allowance of three homesteads in the Orangeburg lands, one to each of the applicants, children of the deceased debtor. Many new and difficult points have arisen under the constitution and laws giving the right of homestead; and it strikes us that the one made here is not only novel in its character, but ingenious. As we understand it, the proposition is, that, as against a debt of the ancestor, his children in possession of lands of his estate are each entitled to a homestead therein, provided such child happens to have a family of his own, and, therefore, may be said to be, in general terms, "the head of a family"; thus multiplying homesteads in the lands of a deceased debtor, according to the number of his children who may happen to be on the lands and to have families of their own. Surely, such could not have been the intention either of the provision in the constitution or of the laws passed to carry it into effect.

The deceased contracted the debts upon which the judgments

were rendered in April and August, 1873, and soon after, in December of the same year, died. Although the judgments were only rendered in 1878, and not transcripted to Orangeburg until 1884, it is quite clear that the question of homestead in lands of the deceased must be determined by the law as it stood in 1873. See *Norton* v. *Bradham*, 21 *S. C.*, 381. At that time the original constitution (1868), without amendment, was of force, which (section 32 of article II.) declared as follows: "The family homestead of the head of each family residing in this State, such homestead consisting of the dwelling house, out-buildings, and land appurtenant, not to exceed, &c., shall be exempt from attachment, levy, and sale on any mesne or final process issued from any court," &c. It is true that the terms of this provision are very general—"the head of each family residing in this State," and "any process from any court," &c.—but can there be a reasonable doubt that, as against the same debts, only one homestead was intended, and that for the protection of the debtor himself or, in the case of death, of his family? Who but the debtor himself, against whom there is process, can need "exemption from process," either for himself or, in certain circumstances, his family? It seems to us that any other interpretation would run counter to the whole spirit and object of the homestead provision.

But if there could have been any doubt arising from the very general terms of the provision in the constitution, we think they were entirely removed by the act of February 22, 1873 (15 *Stat.*, 371), which was passed for the express purpose of carrying that provision into effect. In the first section of that act it abundantly appears that the homestead was intended, at least in the first instance, to exempt the property of the debtor. In providing for the appointment of appraisers to set off the homestead, it directs the sheriff to cause the appointment of three appraisers, "one to be appointed by the creditor, one by the *debtor*, and one by himself, provided, should the creditor or *debtor* refuse," &c. It also declares that when thirty days shall have elapsed after filing the return setting off homestead to the *debtor*, &c., and no good cause has been shown, &c., *such debtor* may have such return recorded," &c. It thus appears that the exemption was given, at least primarily, to the debtor against whom there is process. We cannot

conceive of such a thing as an "independent homestead," simply on the ground that the party is on the land levied, and happens to be "the head of a family." Something more is necessary. Surely, a stranger, without privity with the debtor, could not set up the right; but to be entitled against "any process," the applicant must make the claim either as the debtor himself, or, after his decease, as a member of his family.

It is true that in the case of *Norton* v. *Bradham, supra*, it was held that "the legislature had full power to enact the act of 1874 (15 *Stat.*, 589), which extends to a wife living with her husband, who owns no property, the protection of a homestead exemption as against her own debts." But in delivering the judgment of the court, Judge McIver carefully stated the view thus : "Looking at the constitutional provision now under consideration in this light, it would seem to be a matter of small importance whether the head of a family, or any other member of the family, was the legal owner of the family homestead. That is the thing exempted, and if the sale of it would deprive the family of its home, the mischief, which it was designed to prevent, would ensue, whether it was sold for the debt of the head of the family, or for the debt of some other member of the family, to whom such family homestead legally belonged," &c. Here none of the claimants are the debtors. Although they are claiming exemption in their father's land and as against his debts, they yet claim "independently," each for himself. This, in our judgment, they cannot do. If they are entitled to homestead, it is as their father's family, to whom his right was transmitted, and not as the independent heads of their own families respectively.

Under certain circumstances, "the children" may claim exemption as against debts of the ancestor, but in such case they can only claim as a family. The words, "each family," clearly mean the family collectively as a unit; if the widow be living, "the widow and children," or, if she be dead, "the children" as a class and not severally ; and that, too, without the slightest regard to the fact whether such children are still minors in the family homestead or grown up, emancipated, and having families of their own. This is conclusively shown by the fourth section of the act of 1873, which is the only provision of law under which the appel-

lants as "children" could claim homestead, the father and mother both being dead. That section is as follows: "If the husband be dead, the widow and children, if the father and mother be dead, the children living on the homestead, whether any or all such children be minors or not, shall be entitled to have the family homestead exempted in like manner as if the husband or parents were living; and the homestead so exempted shall be subject to partition among all the children of the head of the family in like manner as if no debts existed: provided that no partition or sale in that case shall be made until the youngest child becomes of age, unless, upon proof satisfactory to the court hearing the case, such sale is deemed best for the interest of such minor or minors." This would seem to be demonstrative that the grant of the exemption to "children," as such, was intended to be a single homestead, to them as a class and not severally. The family homestead is to be exempted to them "in like manner as if the husband or parents were living"; and, besides, such homestead is subject to partition.

But if we clearly understand it, the appellants do not claim their separate homesteads as "children" of the debtor, but independently, in their own right. We confess we cannot so understand it. The debts against which they claim are undoubtedly the debts of their father, and he was also the owner of the land in which the exemption is claimed; and it seems to us that the application itself for homestead as against the debts of the father, is tantamount to an admission that so much of the lands as may not be carved out by the homesteads claimed, will still belong to his estate; and is, therefore, not quite consistent with their claim of absolute title in the lands. It cannot be said that the appellants are claiming "their own individual homestead rights," when there is no debt or process against them individually as the separate heads of families, and their applications are for homesteads against their father's debts, necessarily implying that the lands are also of his estate. If the lands belonged absolutely to the claimants, there would be neither need nor propriety in claiming homesteads as against any debts but their own.

Taking it as shown, that the claims could not be for "independent homestead rights," as against debts of the claimants them-

selves, but for rights derived from the debtor as the head of the family—their deceased father—the applications might have been made under section 8 of the act of 1873 (now substantially re-enacted as section 2002 of the General Statutes), which provides, that "whenever the head of any family, married woman, widow, or *children* shall be entitled to any estate or right of homestead as hereinbefore provided, and no process has been lodged with any officer against such homestead, the party or parties entitled to such homestead may apply at any time by petition to the master of said county, or if there be no master therein, then and in that event to the clerk of the court for said county, to have the same appraised and set off," &c. We cannot say that it was error on the part of the Circuit Judge to sustain the exceptions to the assignment of homestead in the three several cases stated, and to set aside the same.

But, assuming this view to be correct, further exception is taken, that, having reached that conclusion, the Circuit Judge should have ordered a new assignment of one homestead, the family homestead, to the children as a class. We do not think that the judge erred in omitting so to do. He could only decide the question which was before him, the right of each of the three parties to the homesteads as assigned. That as to one homestead had not been made or considered in the tribunal where the proceeding was commenced. After deciding the question made, the judge had no right in his court, and of his own head, to originate a proceeding for the assignment of one in the place of the three claimed. When such application is made in the manner and in the tribunal appointed by law, and it comes up regularly, then will be the proper time to consider whether, in this case, the children as a class are entitled to the family homestead in the Orangeburg lands of the testator, which he disposed of by his will. "The right of homestead is a statutory right, or rather a constitutional right, to be enforced by statutory proceedings under the statutes upon the subject of homestead. The Circuit Court is without original jurisdiction." *Myers* v. *Ham*, 20 *S. C.*, 527.

One of the exceptions complains that it was error to adjudge costs to the plaintiffs against the claimants. It has been held in this State that there is no authority conferred by the code to tax

as costs, in special proceedings, the allowances as costs in an action. *Columbia Water Power Company* v. *Columbia*, 4 *S. C.*, 402. The code defines an action to be "an ordinary proceeding in a court of justice, by which a party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offence;" and declares all other remedies to be "special proceedings." We are not aware that it has ever been decided that an application for homestead under our constitution and laws is not an action, but a "special proceeding," in the sense of the code. It has been held in New York, under a provision in her code identical with ours, that a proceeding for the admeasurement of dower is an action (see *Wait's Ann. Code*, page 19, and authorities), and it would seem that an application for the admeasurement of homestead is not essentially different from that of dower.

But it is not necessary in this case to decide whether it is an action or a special proceeding; for the homestead law does expressly allow certain specified costs in such proceedings. See section 2004, General Statutes. It is true, there is a direction that the costs indicated must be paid "out of the property of the debtor, or in case the homestead is set off to the widow or minor children, out of the estate of the deceased." But it is manifest that this provision contemplated only the case in which the claimant was legally entitled to the homestead, and it was actually set off. But by whom should those costs be paid, when the application turns out to be unfounded and the petition is dismissed? We think the costs ought to be paid by some one. But inasmuch as costs are purely statutory, and the special act upon the subject of homestead makes no provision for costs in the case which has occurred, we know of no law that allows the costs to be taxed against the petitioners. We suppose that the master has received his costs, $5, in each case under the last clause of the section 2004 of the General Statutes, which provides: "Whenever a homestead is laid off as provided, the master or clerk, as the case may be, shall receive as compensation $5 for all services, including the record of the proceedings, but excluding the advertising, which shall not exceed five dollars, and which fees and costs shall be paid in advance by the party claiming the homestead," &c.

The judgment of this court is, that the judgment of the Circuit Court, as herein explained, be affirmed, except as to the costs, which is reversed.

---

### REAGAN v. BISHOP.

1. An action to set aside a sheriff's deed for fraudulent conduct at the sale, and to recover the land, is a case in chancery.
2. Purchasers at sheriff's sale, who were claiming an equitable interest in the property sold, did not avoid the sale by giving, in good faith, notice of such claim.
3. Three persons owning an equal interest in property about to be sold under execution, may lawfully combine to purchase the property jointly, there being no intention to prevent free competition.
4. Finding of fact by referee and Circuit Judge confirmed.
5. Petition for rehearing refused.

Before HUDSON, J., Spartanburg, February, 1886.

The opinion states the case. The Circuit decree was as follows:

The plaintiffs were bound to prove the alleged corrupt combination of the sale and chilling of the bidding by a clear preponderance of evidence. Fraud when alleged must be proven satisfactorily. The evidence, in my judgment, does not justify the referee in finding that there was a contract with Grambling not to bid at the sale—in fact the great weight is against this conclusion; it is not even sufficiently strong to satisfy me that these defendants or any authorized agent ever agreed to let him have twenty-five or thirty acres of land in case they became the purchasers. But even if this were true, it would not vitiate the sale if there was no agreement by the defendants with Grambling not to bid, and if the purpose of the agreement was not to chill the bidding. I really think the plaintiffs have failed on this essential allegation of this complaint.

As to the announcement of Mr. Cleveland, attorney for defendants, at the sale, it was made in the best of faith, and he was in duty bound to make it, as otherwise his clients might have been

seriously prejudiced in the suit then pending between these plaintiffs and defendants about this same land.

Now, after this sale and purchase the present defendants under arbitration secured the renunciation of Mrs. Reagan's dower in her husband's estate in this land. This gave, as defendants claim, a perfect title to them in the whole land. And after this the appeal pending in the Common Pleas, involving the question of title to this land between these same litigants was marked on the calendar *settled.* A serious question might be raised whether that might not have been pleaded in bar to the present controversy. No such question is raised, and I do not say the plea would have been good.

It is ordered, adjudged, and decreed, that the plaintiffs' exceptions to the referee's finding of fact that an illegal agreement was made with Grambling by the defendants be reversed, and that his judgment be sustained, as well on the ground on which it is based as upon the grounds upon which it should further have been based. It is further ordered that the complaint be dismissed with costs.

From this decree plaintiffs appealed.

*Mr. J. S. R. Thomson,* for appellants.

*Messrs. Bomar & Simpson* and *G. W. Nichols,* contra.

November 22, 1886. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. This was an action to set aside a sheriff's deed of a tract of land containing 250 acres, and for the recovery of the same. It was referred to Charles P. Wofford, Esq., as special referee, to hear and determine the issues, when the following facts appeared :

In 1860 the land in dispute was sold by the commissioner in equity. At that time Mark Reagan and his three sisters, Martha, Ailsy, and Harriet, were living on the land, which, as we suppose, had been the property of their father, and it was bid off by the brother, Mark Reagan, for $960, payable in two equal annual instalments. The bond for the purchase money was signed by

Mark and the three sisters, who were all older than he was.    It seems from the credits on the bond, that most of the payments were made by the sisters in Confederate bills, and by receipting for their shares of the purchase money, who had means of their own derived from the sale of homespun cloth and teaching school; but they were entered as made "for Mark Reagan," and the deed was made to him individually.  The brother and sisters continued to live together on the place as one family, until one after another the parties all married except Harriet.   Martha married E. L. Pope, and Ailsy one Bishop.   Mark also married in 1863 or '4, and died intestate in 1877, leaving a widow, Lavinia, and three infant children, James, Hattie, and Emma, the plaintiffs.    The widow administered upon the estate of her deceased husband, and a judgment was recovered against her as administratrix, upon a debt of her intestate.

After the death of their brother Mark, the three sisters commenced suit in the Probate Court for partition of the land, claiming that they and their brother had paid equally for it, and each was entitled to one-fourth interest, although for convenience the deed had been made to the brother Mark alone.   The probate judge ruled against the sisters, but they appealed to the Court of Common Pleas; and, pending that appeal, the judgment which had been recovered against Lavinia as administratrix, was levied upon the whole land, which was sold as the property of Mark Reagan, deceased.   At the sale Mr. Cleveland (attorney for the sisters in the probate suit) announced that only one-fourth interest would go to the purchaser, and any one buying and attempting to hold the whole of it, would buy a law suit.   Mrs. Bishop bid off the land for $185, and the sheriff's deed was made to the three sisters.   They obtained from Lavinia, the widow, the relinquishment of her dower for $150, and she, with her children, left the place, and the probate appeal was marked "settled."

Afterwards Lavinia, the mother, died, and the children of Mark Reagan brought this action for the land, alleging that the whole legal title was in their father, Mark, and descended to them; and charging that the sheriff's sale should be set aside as void, upon the ground that the sisters fraudulently and illegally combined to chill the biddings, both by causing notice to be

given of their claims in the pending probate proceedings and by making an alleged agreement with one Grambling to sell him a small part of the land—some thirty acres—as an inducement for him not to bid at the sale, which enabled them to get the land at a sacrifice. The defendants positively denied the alleged agreement with Grambling.

After much testimony, the referee found that there was "an understanding among the sisters that one should buy for herself and the others, and that Grambling should have the benefit of the purchase to the extent of twenty-five or thirty acres; but that it was not shown that the low price of the land could be attributed to that arrangement; that under the circumstances the land brought as much as a prudent man would be willing to pay," &c. To this report the plaintiffs filed exceptions, and the defendants also gave notice that if the report of the referee could not be maintained on the grounds on which it was placed, they would ask that it should be sustained on the following grounds: first, that the proof showed no such agreement as that set out in the complaint; and, second, if made, it was not such as to avoid the sale, and the referee erred in finding that it was sufficient.

The cause came on to be heard by Judge Hudson, who held that "the announcement of Mr. Cleveland, attorney for the defendants, at the sale, was made in the best of faith, and he was in duty bound to make it, as otherwise his clients might have been seriously prejudiced in the probate suit then pending about the same land; and that the evidence did not justify the referee in finding that there was a contract with Grambling not to bid at the sale—in fact, the great weight is against such conclusion." And so holding, he sustained the referee's report, both on the grounds upon which it was based, as well as others, and dismissed the complaint.

To this decree the plaintiffs filed numerous exceptions, which are in the "Brief" and need not be restated here. The questions made are substantially these: I. Was the announcement made at the sale by the attorney of defendants sufficient to avoid their purchase, and the sheriff's deed to them ? II. Was there any agreement between defendants and any other person as to not bidding at the sale ? And if so, did it have the effect of making

the land sell for an under value ?   III. Was the decree based on any testimony which was improperly admitted ?

Is this an action at law or a case in chancery ?   Considered simply as an action to recover the land, it is clearly the former— nothing more nor less than trespass to try titles.   In this view, the Circuit Judge having found as matter of fact, that the defendants did not make a contract with Grambling not to bid at the sale, nor combine in such a manner as to prevent fair and full competition, this court would have no right to review the evidence, as in that case our jurisdiction would be confined solely to the correction of errors of law, assuming the facts to be as found. But looking to the matters charged as the grounds of recovery, we find the prayer is, that the sheriff's deed to the defendants may be set aside as void, the defendants, as alleged, having purchased the land for less than its value, caused by a fraudulent combination on their part to chill the biddings, both by having it announced at the sale that each of the sisters claimed a fourth interest in the land, and also by making an agreement with one Grambling not to bid at the sale.   These are matters cognizable only on the equity side of the court, and would seem to characterize it as a case in chancery.   So considering, this court, sitting as an appellate tribunal, has the right to review the whole evidence and to determine all the questions in the case, whether of fact or of law.

First, as to the announcement at the sale.   As we understand it, the defendants had nothing to do with levying and selling the land under execution.   They were prosecuting their appeal from the Probate Court to establish their claim that they paid part of the purchase money of the land, and were entitled to equitable rights therein, when it was advertised to be sold under execution as the property of their deceased brother Mark.   What could they do but give notice of their claim or abandon it, as an innocent purchaser without notice of their alleged equities would have been entitled to hold it against them ?   As the sale under execution could carry nothing more than the interest of Mark, whatever that might be, we can have no doubt that the notice given, tending to limit that interest, did reduce the price at which the land was sold.   But we cannot see that for that reason it was

illegal and sufficient to avoid the sale. Mr. Cleveland made no false statement. What he said as to the pending appeal from the Probate Court was in fact true, and everything else he said about buying a law suit, &c., was, of course, mere matter of opinion, as to which all persons were at liberty to form their own judgments.

Such notices at sheriff's sales are not at all uncommon. In this case, of course, the court could not hear and determine the appeal from the Probate Court. It is not known, and probably never will be, whether the opinion of Mr. Cleveland was well founded or not, and therefore we are not authorized to assume that the sisters had no interest in the land, and that the notice was pretensive merely to chill the biddings. On the contrary, without regard to whether that opinion was or was not sound, we concur with the Circuit Judge that "the announcement of Mr. Cleveland was made in the best of faith, and he was in duty bound to make it, as otherwise his clients may have been seriously prejudiced in the suit then pending between the plaintiffs and defendants about this same land," &c.

Second. As to the alleged combination to prevent free and full competition. It has been settled in this State, "that the principle which governs all sales at auction, and especially judicial sales, is, that there should be full and fair competition. Any agreement or combination, therefore, the object and effect of which is to chill the sale and stifle competition is illegal, and no party to the agreement or combination can derive benefit from the sale," &c. See *Hamilton* v. *Hamilton*, 2 *Rich. Eq.*, 355; *Barrett* v. *Bath Paper Company*, 13 *S. C.*, 156, and authorities cited. We do not understand that every agreement of parties to buy together will avoid a sale. Several persons may unite in making a purchase, one bidding for all, provided there is no intention thereby to prevent free competition. As was said in *Hamilton* v. *Hamilton*, *supra*, "It is shown in that, as in other cases, that persons may properly unite for the purpose of making a bid among themselves, where no one of the associates was able to purchase or desired to own the entire property exposed to sale, the effect of such an agreement is to advance the object which the policy of the law favors, a fair price to the parties interested in the article sold," &c.

It was not shown that the sisters agreed beforehand for one to bid for herself and the others. As it turned out, however, Mrs. Bishop did bid for all. But if there had been a previous understanding to that effect, we do not think it would have been sufficient to avoid the sale. There is no principle or rule of law, which requires every one at a sale to become a bidder or even all of those who may desire a part of the property sold. The sisters were claiming in the same right as tenants in common—each wanted a part, but neither wanted the whole of the land, and we cannot see that the fact that one of them bid for the land and had it set down to all of them was any violation of the salutary principle adopted for the purpose of securing full and fair competition at auction sales. See *Carson* v. *Law,* 2 *Rich. Eq.,* 307.

But it is urged that the defendants combined with Grambling, a stranger, and induced him not to bid at the sale, by agreeing to sell him 25 or 30 acres of the land at the price which it might bring at the sale, and that they reaped advantage from this agreement in the reduced price at which they purchased the land. This was a question of fact, as to which the referee, after full and careful consideration, found that there was some agreement with Grambling about selling him a part of the land, but that it was not shown that such agreement had any effect in reducing the price at which the land sold; while the Circuit Judge went further and found that "the evidence did not justify the referee in finding that there was a contract with Grambling not to bid at the sale; in fact, the great weight is against this conclusion. It is not even sufficiently strong to satisfy me that the defendants or any authorized agent ever agreed to let him have twenty-five or thirty acres of the land, in case they became the purchasers," &c.

The rule of this court, when the Circuit Judge concurs with the referee upon a question of fact, is well known. We have read the testimony carefully, and we cannot say that the finding of the Circuit Judge is without evidence to support it. The allegation was that the illegal agreement was made by Grambling with Elijah Pope, the husband of one of the three sisters, in going to the court house on the morning of the sale, and was afterwards ratified by the sisters (Harriet was not at the court house that day), in the office of Mr. Cleveland. No one but Grambling him-

self says that the sisters made any contract about his not bidding at the sale. Mr. Cleveland says there was some agreement in his office; but he did not know with whom it was made, and he does not think there was any understanding that Grambling was not to bid at the sale—thought the sale was fair. All the other parties positively deny that there was any such agreement or understanding. Besides, if the notice given by Mr. Cleveland at the sale touching the claim of the sisters, was taken as showing a serious cloud upon the title except as to one-fourth, as the referee found, the land was not sold at a sacrifice.

As the appeal from the probate judge, involving the merits of the sisters' claim, was not before the Circuit Judge for adjudication, the testimony of Eliza Bolling and Mrs. Bishop upon that subject was irrelevant to the issues in the case, and not having been considered, we do not think it necessary to go into the subject of its admissibility. In the view taken it did not in the least affect the decree rendered.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

The plaintiffs filed a petition for rehearing, claiming that they were entitled certainly to three-fourths interest, and asking "that an issue be allowed between plaintiffs and defendants as to what interests or what equities, if any, the defendants had in said land at the time of sale." Upon this petition,

